```
              UNITED STATES DISTRICT COURT
                 DISTRICT OF NEW JERSEY
```

| | |
|---|---|
| ERNEST F. IRONS<br><br>    Plaintiff,<br><br>  v.<br><br>HOWARD N. MATTHEWS, et al.,<br><br>    Defendants. | HONORABLE JOSEPH E. IRENAS<br><br>CIVIL ACTION NO. 04-4825<br>         (JEI/JS)<br><br>**OPINION** |

**APPEARANCES:**

ROSSI, BARRY, CORRADO & GRASSI, PC
By: Stephen William Barry, Esq.
2700 Pacific Avenue
Wildwood, NJ 08260
    Counsel for Plaintiff

DANIEL NICHOLAS GERMAN, ESQ.
E-107 Cooper River Plaza
2400 McClellan Avenue
Pennsauken, NJ08109
    Counsel for Defendant

**IRENAS**, Senior District Judge:

    Plaintiff Ernest Irons brings this action against his former employer, Defendant Howard Matthews[1], alleging that Defendant is liable for injuries Plaintiff sustained in an boating accident that occurred while Plaintiff was working on Defendant's crabbing vessel. Plaintiff alleges that Defendant was negligent under the Jones Act, 46 U.S.C. § 688, *et. seq.* Plaintiff also alleges the unseaworthiness of a ship owned and operated by Defendant, and

---

    [1] In deposition testimony, Defendant is referred to as "Buttons."

asks for maintenance and cure pursuant to general maritime law. This Court has jurisdiction pursuant to 28 U.S.C. § 1333.

Defendant moves for summary judgment based on a release executed by Plaintiff. Additionally, Plaintiff brings a cross-motion for summary judgment, requesting that the Court void the release and hold that the Defendant is liable for all Plaintiff's claims. For the reasons set forth below, the Defendant's Motion for Summary Judgment will be denied, and Plaintiff's Motion for Summary Judgment will be denied in part and granted in part.

**I.**

In 2002, Plaintiff, then 22, worked on a crabbing vessel owned and operated by the Defendant. On May 24, 2002, Defendant, who was operating the boat, and Plaintiff, who was crewing it, were involved in a boating accident in Cape May Harbor, New Jersey. Defendant, distracted by looking at porpoises, hit a channel marker and was thrown from the boat.[2] (White Aff. ¶ 4; Matthews Dep. 50:14-51:5) The vessel was equipped with a lanyard cut-off switch, which "kills" the engine if the lanyard is pulled and is supposed to be worn by the boat's operator. (Tallman Aff.

---

[2] Defendant's attorney, Robert B. White, Jr. has submitted an affidavit, which sets forth testimony about topics about which White appears to have no personal knowledge. It appears, however, that White's affidavit was intended to serve as Defendant's Statement of Undisputed Facts and the Court will treat it as such.

¶ 7.)  However, Defendant was not wearing the lanyard.[3] (Matthews Dep. 47:1-49:1.)  After Defendant was ejected from the boat, the boat continued moving and eventually hit the marshes, resulting in a second impact.  Plaintiff sustained serious injuries in the accident, including injuries to his vertebrae and scapula.  In the weeks that followed, Plaintiff received medical care from various doctors and underwent surgery.  (White Aff. ¶ 8-15.)

Plaintiff and his family had a longstanding, close relationship with Defendant.  Plaintiff considered Defendant to be "a member of the family."  (Irons Aff. ¶ 3.)  Moreover, Plaintiff's father also worked for Defendant.  (Pl. Stmt. of Undisputed Facts ¶ 3.)  Additionally, prior to the accident, Plaintiff's family had rented a house from Defendant, which they, including Plaintiff, moved into after the accident. (Matthews Dep. 69:12-23.)

After the accident, Defendant received the full amount of the $250,000 protection and indemnity insurance policy he had on his vessel, and he used $224,401.03 of this insurance money to pay for Plaintiff's medical bills.  (White Aff. ¶ 16-20.)

---

[3] The Marine Police later issued Defendant tickets for failure to wear the lanyard cut-off switch and for careless operation.  Defendant pled guilty to the former charge and the latter was dismissed.  (Cote Cert. Ex. B.)  Plaintiff's expert, William Tallman, Jr. asserts that Defendant's operation of the crabbing vessel violated several New Jersey Boating statutes. (Tallman Aff. ¶ 6-8.)

Defendant also made $1,750 in "intermittent payments" to Plaintiff, from May 31, 2002 to August 1, 2002, although the purpose and source of this payment is unclear.  (White Aff. ¶ 21.)  Plaintiff returned to work for Defendant that fall.  (Irons Dep. 82:3-11.)

Aware that there was only $23,000 remaining in the insurance payout[4], Defendant asked Plaintiff to sign a document, releasing him from all further claims (the "Release").  (Matthews Dep. 62:13-16.)  Defendant asserts that Plaintiff was aware that he had $23,000 of insurance money remaining, but Plaintiff claims that he believed that the insurance money had been depleted and any further settlement would be paid by Defendant out-of-pocket.  (Irons Dep. 90:7-92:18.)  Plaintiff asserts that Defendant told him that "lawyers weren't necessary" and that "he would take care of [him]."  (Irons Dep. 89:5-10).  Although it is clear that Plaintiff did not consult an attorney or seek legal advice,[5] it is not apparent to what extent the terms of the settlement were

---

[4] Although Defendant asserts that $23,000 remained from the insurance payoff, it appears that this was an approximate figure.

[5] Plaintiff asserts he did not seek legal advice because Defendant advised him that if lawyers were involved Defendant would be "ruined."  Moreover, Plaintiff's parents advised him not to seek legal advice because they were having money troubles and Defendant had assisted them by selling them a car cheaply to replace one that had been repossessed.  (Irons Aff. ¶ 4-5.) Defendant asserts Plaintiff voluntarily did not seek legal advice, because he felt as if Defendant were his grandfather.  (Matthews Dep. 61:1-6.)

discussed prior to the signing of the Release.  However, a day or two prior to executing the agreement, Plaintiff understood that he was going to sign a release in exchange for $15,000 and a truck.  (Irons Dep. 102:12-23.)  The settlement in total was supposed to be for $23,000.  It appears that Defendant decided on this amount, not by an estimation of Plaintiff's future medical costs, but because it was the amount remaining from Defendant's insurance.  (Matthews Dep. 73:21-74:1.)

    On October 31, 2002, Plaintiff and Defendant, both unrepresented by counsel, executed the Release in the office of an attorney who represented a family member of Defendant in an unrelated matter.  Defendant provided the Release, a pre-printed form in black and red type with space provided to write-in the particulars of the settlement, that he had previously obtained to deal with prior, unrelated situations.  (Matthews Dep. 62:4-12.)  Plaintiff claims he filled out and signed the form as instructed by Defendant.  (Irons Dep. 111:21-112:2.)  Plaintiff also claims he may have been under the influence of drugs when he signed the release.[6]

    The Release stated that in exchange for $23,000 dollars, which Plaintiff had already received, Plaintiff released

---

[6] Plaintiff took some Percocet shortly before signing the release.  Generally speaking, at that time, he was also using other drugs including OxyContin, heroin, and marijuana.  (Irons Dep. 100:1-17.)

Defendant and his wife from all claims and rights arising out of his back injury.  (Def. Summ. J. Br. Ex. K.)  It then re-iterated, in various ways, that this Release settled all claims, present or future, for damages, maintenance, cure, and wages.  At the time he executed the Release, Plaintiff did not know what maintenance and cure was.  (Irons Dep. 115:17-116:4.)  Three witnesses from the attorney's office signed the Release, as did a notary public.

However, the Release did not comport with the reality of Defendant's payments to Plaintiff.  First, contrary to what was stated in the Release, Plaintiff had not yet received a $23,000 payment when the Release was executed.  Second, without Plaintiff's knowledge, Defendant agreed with Plaintiff's parents to pay Plaintiff's settlement directly to his parents, rather than to Plaintiff.[7]  (Irons Dep. 92:22-96:22)  Defendant subsequently paid three checks to Plaintiff's mother, totaling $15,224.  Third, Defendant may not have paid Plaintiff the full value of the $23,000 settlement.  It is undisputed that Defendant paid Plaintiff's mother $15,224 and purchased a truck for Plaintiff, costing $7,500.  The total value of these payments is $22,724, which is less than the promised $23,000 settlement

---

[7] Plaintiff's parents requested that the payment be made in this manner, because they were worried that their son would use the funds to pay for drugs.

payment.[8]

Plaintiff alleges that at some point after the Release had been executed, he had a second surgery for issues arising out of the injuries he received during the accident. Plaintiff was surprised that Defendant refused to pay for his bills, because he thought the he would continue to take care of him like a member of the family. (Irons Aff. ¶ 7-8.) The instant suit followed.

## II.

"[S]ummary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. P. 56(c)). In deciding a motion for summary judgment, the Court must construe the facts and inferences in a light most favorable to the non-moving party. *Pollock v. Am. Tel. & Tel. Long Lines*, 794 F.2d 860, 864 (3d Cir. 1986). The role of the Court is not "to weigh the evidence and determine the truth of the matter, but

---

[8] Defendant also claims that he paid $2,578 to re-instate a license for Plaintiff. It is disputed whether this payment was considered part of the settlement. (Pl. Resp. to White Aff. ¶ 57.) Plaintiff also claims that he understood that Defendant would help him secure a job offer, although this promise was not recorded in the Release.

to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

The summary judgment standard is not affected when the parties file cross-motions for summary judgment. *See Appelmans v. City of Phila.*, 826 F.2d 214, 216 (3d Cir. 1987). Such motions "'are no more than a claim by each side that it alone is entitled to summary judgment, and the making of such inherently contradictory claims does not constitute an agreement that if one is rejected the other is necessarily justified or that the losing party waives judicial consideration and determination whether genuine issues of material fact exist.'" *Transportes Ferreos de Venez. II CA v. NKK Corp.*, 239 F.3d 555, 560 (3d Cir. 2001) (quoting *Rains v. Cascade Indus., Inc.*, 402 F.2d 241, 245 (3d Cir. 1968)). If after review of cross-motions for summary judgment the record reveals no genuine issues of material fact, then judgment will be entered in favor of the deserving party in light of the law and undisputed facts. *Iberia Foods Corp. v. Romeo*, 150 F.3d 298, 302 (3d Cir. 1998).

### III.

Defendant moves for summary judgment, alleging that the Release executed between the parties bars Plaintiff from bringing any claims against him arising out of the accident. Plaintiff brings a cross-motion for summary judgment, alleging that the

Release is invalid and that Plaintiff should be granted summary judgment on the issue of liability for his Jones Act claim, his claim that the vessel was unseaworthy, and his claim for maintenance and cure. The Court will address each issue in turn.

### 1. Validity of the Release

Seamen are "wards of the admiralty." *Delaware River & Bay Authority v. Kopacz*, 584 F.3d 622, 627 (3d Cir. 2009) (quoting *Barnes v. Andover Co., L.P.*, 900 F.2d 630, 642 (3d Cir. 1990)). Although they are not technically incapable of entering into a valid contract, the courts of equity treat them in the same manner as these courts treat wards in dealing with their guardians. *Garrett v. Moore-McCormack Co.*, 317 U.S. 239, 246 (1942). Thus, a release executed by a seaman is subject to careful scrutiny and the party offering a seaman's release as a defense has the burden of showing that the release was executed freely, without deception or coercion, and that it was made by the seaman with full understanding of his rights. *Garrett*, 317 U.S. at 248.

In reviewing a seaman's release, the Court must determine "whether the release was executed freely, without deception or coercion" and "whether the seaman entered the settlement with a full understanding of his rights." *Jackson v. Delaware River and Bay Authority*, 334 F. Supp. 2d 615, 617-18 (D.N.J. 2004) (Irenas, J.) (citing *Garrett*, 317 U.S. at 239). The critical issues under

this analysis include the adequacy of consideration and the nature of the medical and legal advice available to the seaman. *Id.*

In the context of admiralty jurisdiction, summary judgment is often considered an inappropriate procedure to determine the validity of a seaman's release. *In re Complaint of Bankers Trust Co.*, 636 F.2d at 39. Indeed, on a motion for summary judgment based on a seaman's release, "the shipowner has an even heavier burden to shoulder, for he must conclusively demonstrate the absence of genuine issues of material fact." *Halliburton v. Ocean Drilling & Exploration Co.*, 620 F.2d 444, 445 (5th Cir. 1980).

In this case, a reasonable factfinder could only find that Plaintiff entered the settlement without a full understanding of his rights. It is evident from the record that Plaintiff did not consult with an attorney, nor were his rights, including claims of maintenance and cure, ever explained to him.[9] As such, the Court holds the Release to be void. Accordingly, the Court denies Defendant's motion for summary judgment, and grants Plaintiff's cross-motion for summary judgment with regard to the invalidity of the Release.

### 2. Defendant's Liability Under the Jones Act

---

[9] Additionally, the record raises serious issues about the adequacy of the consideration, and the circumstances under which the settlement was agreed to and paid out.

Plaintiff argues that he is entitled to summary judgment on his Jones Act claim, because Defendant was *per se* negligent. Under the Jones Act, *per se* negligence may be shown by establishing five factors: "(1) a violation of Coast Guard regulations, (2) the plaintiff's membership in the class of intended beneficiaries of the regulations, (3) an injury of a type against which the regulations are designed to protect, (4) the unexcused nature of the regulatory violation, and (5) causation." *Smith v. Trans-World Drilling Co.*, 772 F.2d 157, 160 (5th Cir. 1985); *accord*, *Fuszek v. Royal King Fisheries, Inc.*, 98 F.3d 514, 517 (9th Cir. 1996). Plaintiff argues that Defendant was *per se* negligent because he did not wear a lanyard cut-off switch while operating his boat, in violation of the New Jersey Administrative Code § 13:82-1.15. *See* N.J. Admin. Code § 13:82-1.15 ("the operator of a vessel equipped with a lanyard cut-off switch shall wear the safety switch lanyard at all times when the vessel is in operation.").

Defendant argues that *per se* negligence does not apply, as Defendant did not violate a *Coast Guard* regulation. The Court agrees. While Defendant's failure to properly employ the lanyard cut-off switch may be evidence of negligence, this Court will not expand the test of *per se* negligence beyond the narrow set of factors specifically detailed in the *Trans-World Drilling Co* decision. *See, e.g., Jones v. Spentonbush-Red Star Co.*, 155 F.3d

587 (2d Cir. 1998) (declining to find that the violation of a Occupational Safety and Health Administration regulation constituted negligence *per se* under the Jones Act.)  Accordingly, the Court denies Plaintiff's cross-motion for summary judgment with regard to his Jones Act claim.

### 3.  **Seaworthiness of the Vessel**

Plaintiff argues that Defendant's failure to wear the lanyard cut-off switch rendered the crabbing vessel unseaworthy. In response, Defendant argues that vessel, itself, was seaworthy as it was equipped with a lanyard cut-off switch, albeit one that was improperly utilized by Defendant.  A ship is unseaworthy if it or its appurtenances are not "reasonably fit for their intended use." *Mitchell v. Trawler Racer, Inc.*, 362 U.S. 539, 550 (1960).  A vessel's unseaworthiness could arise out of a number of conditions.

> Her gear might be defective, her appurtenances in disrepair, her crew unfit. The number of men assigned to perform a shipboard task might be insufficient. The method of loading her cargo or the manner of its stowage, might be improper. For any of these reasons, or others, a vessel might not be reasonably fit for her intended service.

*Edynak v. Atlantic Shipping, Inc. Cie Chambon Maclovia S.A.*, 562 F.2d 215, 222 (3d.Cir. 1997) (quoting *Usner v. Luckenbach Overseas Corp.*, 400 U.S. 494, 499 (1971)). Furthermore, "unseaworthiness may be either a temporary or permanent condition."  *Id.*  A shipowner has an absolute duty to provide a

12

seaworthy ship.  *Mitchell*, 362 U.S. at 550.  It is an issue of disputed fact whether equipping a vessel with a lanyard cut-off switch, but not wearing the switch during the boat's operation, renders a vessel unseaworthy.  Therefore, the Court denies Plaintiff's motion for summary judgment with regard to his claim that the vessel was unseaworthy.

**4.  Maintenance and Cure**

Plaintiff argues that although Defendant paid for medical expenses related to his first surgery and some maintenance, Defendant is liable for maintenance and cure related to later complications arising from the spinal injuries Plaintiff suffered in the accident.  Specifically, Plaintiff alleges he was "re-hospitalized because of an infection and complications regarding the wound to his spine," resulting in a second surgery.  (Pl. Br. in Support of Cross-Mot. 18; Irons Aff. ¶ 7.)  Further, Plaintiff alleges that Defendant refused to pay any of this later medical bills.  (Irons Aff. ¶ 7.)

"Maintenance and cure are rights given to seamen who become ill or injured in the service of a vessel" *Deisler v. McCormack Aggregates, Co.*, 54 F.3d 1074, 1079 (3d Cir. 1995).  A "shipowner is obligated to pay maintenance and cure until the seaman has reached the point of maximum cure, that is until the seaman is cured or his condition is diagnosed as permanent and incurable." *Barnes*, 900 F.2d at 633-34.

13

In the face of Plaintiff's claim, Defendant has only provided one defense -- that he is excused from any claim for maintenance and cure due to the Release.  As the Court has found the Release to be invalid, this defense fails.  Nonetheless, Plaintiff still bears the affirmative burden of proving his claim.  The record related to Plaintiff's later hospitalization is vague at best.  While Plaintiff may later be found to be entitled to maintenance and cure, the record is insufficient at this stage for the Court to make such a determination.  Accordingly, the Court denies Plaintiff's motion for summary judgment with respect to his claim for further maintenance and cure.

**IV.**

For reasons set forth above, the Court will deny Defendant's motion for summary judgment.  The Court will grant Plaintiff's cross-motion for summary judgment with regard to the invalidity of the Release, but will deny the motion with regard to his claim under the Jones Act, his claim that the vessel was unseaworthy, and his claim for maintenance and cure.  The Court will issue an appropriate order.

Date: June 15, 2010

                                                      s/ Joseph E. Irenas  
                                            JOSEPH E. IRENAS, S.U.S.D.J.